**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 12-cv-03308-MSK

**ROBERT A. ALARID,**

      Plaintiff,

v.

**CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,**

      Defendant.[1]

**OPINION and ORDER**

**THIS MATTER** comes before the Court on Plaintiff Robert A. Alarid's appeal of the Commissioner of Social Security's final decision denying his application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83c. Having considered the pleadings and the record, the Court

**FINDS** and **CONCLUDES**

**I.     Jurisdiction**

Mr. Alarid filed a claim for disability insurance benefits pursuant to Titles II and XVI, asserting that his disability began on December 15, 2009. After his claim was initially denied, Mr. Alarid filed a written request for a hearing before an Administrative Law Judge ("ALJ"). This request was granted and a hearing was held on July 21, 2011.

---

[1] At the time Mr. Alarid filed his appeal, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin is substituted as the Defendant in this action to reflect her designation as Acting Commissioner of Social Security, effective February 14, 2013.

After the hearing, the ALJ issued a decision which found that Mr. Alarid met the insured status requirements through December 31, 2014. Applying the five-step disability evaluation process, the Decision also found that: (1) Mr. Alarid had not engaged in substantial gainful activity since December 15, 2009; (2) he had the following severe impairments: degenerative joint disease of the left knee, status post anterior cruciate ligament ("ACL") repair with partial replacement, low back pain and degenerative disk disease of the lumbar spine; (3) he did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpt. P, Appx. 1 ("the Listings"); and (4) Mr. Alarid had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567 and 416.967[2] with the following additional limitations: standing and walking no more than four hours in an eight hour workday; sitting no more than six hours in an eight hour workday; the ability to change position and sit or stand as needed two to three times per hour, or every twenty to thirty minutes; no foot pedal operation with his left foot; occasionally stooping, kneeling, crouching, crawling and climbing stairs and ramps; never climbing ladders; and avoiding unprotected heights and concentrated exposure to extreme cold. Given the above RFC, the Decision ultimately found that Mr. Alarid was not disabled because he was capable of performing his past relevant work as a prison security guard, private security guard and lot manager.

The Appeals Council denied Mr. Alarid's request for review of the Decision. Consequently, the Decision is the Commissioner's final decision for purposes of judicial review. *Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th Cir. 2011). Mr. Alarid's appeal was timely

---

[2] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition. Hereafter, the Court will only cite the pertinent Title II regulations governing disability insurance benefits, found at 20 C.F.R. Part 404. The corresponding regulations governing supplemental security income under Title XVI, which are substantively the same, are found at 20 C.F.R. Part 416.

brought, and this Court exercises jurisdiction to review the Commissioner of Social Security's final decision pursuant to 42 U.S.C. § 405(g).

## II.     Material Facts

The material facts are as follows.

Mr. Alarid was born in 1963 and has a 12th grade education. His past jobs included security guard, pipe grinder and inspector, tree services laborer, lot manager and forklift driver. He suffers from degenerative joint disease and arthritis in his left knee, degenerative disk disease in his lumbar spine, as well as numbness and swelling in his arms and fingers.

### A. Medical Treatment

Mr. Alarid received regular physical exams and treatment for his knee and lower back in 2010 and 2011. In March 2010, he was examined by Ms. Phillips, a nurse practitioner, who wrote that he had a normal gait, range of movement, muscle strength, tone and stability but did have pain and tenderness in his left knee. He was given Volteran for knee pain and referred to an orthopedist. Ms. Phillips prescribed him Flexeril for low back pain and recommended relaxation exercises and alternating heat and ice.

In April 2010, Mr. Alarid saw an orthopedist, Dr. Daines. Based on a physical exam, he concluded that Mr. Alarid had normal stability but limited range of movement in his left knee along with mild tenderness. X-rays of Mr. Alarid's knee showed a previous ACL repair with joint space narrowing and medial and lateral osteophytes on both the tibia and femur. Dr. Daines concluded that Mr. Alarid had left knee arthritis, and administered a cortisone and lidocaine injection. Dr. Daines also advised Mr. Alarid that he would eventually need a left knee replacement, but that it was risky for younger patients and he should wait as long as possible.

One month later, Mr. Alarid again saw Ms. Phillips with complaints of chronic knee and lower back pain. She concluded that he had spasms in his lumbar spine and left knee pain that caused a limp. She prescribed Meloxicam to help with his knee pain and encouraged him to increase low-impact exercise.

In July 2010 Mr. Alarid complained to Dr. Prater of chronic left knee and lower back pain. Mr. Alarid said he had been taking Mobic but that it didn't help his pain. He also stated that the April 2010 left knee injection relieved his pain for only three weeks. Dr. Prater reviewed knee and back x-rays and concluded that Mr. Alarid had a small osteochondroma on the fibular head in his left knee and mild degenerative changes with a small osteophyte at L4 in his lumbar spine. During a physical examination, Mr. Alarid had muscle spasms in his back but had a normal gait, sciatic notch and lumbar vertebrae, negative straight leg tests, normal hip range of movement and normal muscle strength in his legs. Dr. Prater gave Mr. Alarid a second knee injection and Neurontin 100mg for his knee pain, and recommended stretching and Mobic for his lower back pain.

Dr. Prater again examined Mr. Alarid in August 2010. He complained of pain, "popping," and decreased stability in his left knee and told Dr. Prater that it felt better for only one week after his July 2010 injection. During her examination, Dr. Prater found that Mr. Alarid had crepitus, effusion, warmth, tenderness to palpation and decreased range of movement in his left knee. However, he had normal stability and strength as well as negative anterior draw, Lachman, McMurray and stress tests. An MRI of Mr. Alarid's left knee showed small joint effusion as well as cystic changes and edema within the tibial plateau.

In August, Mr. Alarid also returned to Dr. Daines for examination. He found that Mr. Alarid had limited range of motion and tenderness in the left knee, but stable stress tests. He

concluded that Mr. Alarid had mild arthritis with tibial plateau cysts, and recommended a knee arthroscopy.  In recommending arthroscopy, Dr. Daines also wrote in his notes that he wanted to "buy Mr. Alarid some time" before a knee replacement given his young age.  He also observed that Mr. Alarid had struggled with knee pain for a while and that steroid injections had failed.

Mr. Alarid followed Dr. Daines' recommendation and the left knee arthroscopy was performed on September 16, 2010.  Dr. Daines made the following surgical observations: the medial compartment had grade three to four changes throughout, a meniscus tear but no loose bodies; the ACL notch was completely filled with scar material and Dr. Daines was unable to find the ACL; the patellofemoral compartment had essentially no cartilage on the patella with grade two or three changes in the trochlea; the lateral compartment had two large, loose bodies and grade two or three changes; and there were crystal deposits throughout the knee, likely due to crystalline pyrophosphate disease.  Dr. Daines removed the loose bodies, performed a debridement of the meniscus, removed most of the crystalline deposits and injected the knee with lidocaine and epinephrine.

Having performed the arthroscopic procedure, Dr. Daines saw Mr. Alarid for several follow-up appointments in September and October 2010.  Although there was minimal swelling and the knee was stable, Dr. Daines emphasized in his treatment notes that Mr. Alarid had much more arthritis than anticipated.  He wrote that Mr. Alarid had pain similar to before the September arthroscopy and that it continued to interfere with his daily activities.  Examinations showed an antalgic gait, tenderness, mild effusion and limited range of motion.  Ultimately, Dr. Daines' assessment was left knee osteoarthritis.  He wrote: "[Mr. Alarid] continues to struggle. We have tried injections, therapy and knee scope.  He is still quite disabled.  I think he is at the point where total knee replacement is the next step."

Mr. Alarid continued to see medical personnel for his knee and lower back pain. In November 2010 he saw Dr. Schmidt, who gave him clearance for a total knee replacement and wrote that he had a normal gait and was able to walk up stairs with groceries without shortness of breath, although he did experience knee pain with such activity. Two months later, Mr. Alarid returned to Dr. Prater with complaints of left knee and lower back pain. A musculoskeletal exam showed normal gait, station, range of movement, stability, muscle strength and tone. He was scheduled for knee replacement. Dr. Prater ordered an MRI for his back pain but recommended conservative management to include prednisone, baclofen and norco. She also suggested epidural injections and a referral to neurosurgery. A February 2011 MRI of the lumbar spine show degenerative disk disease at the L3-L4 level with a left lateral disk bulge, mild left-sided L3 stenosis and effacement of the exiting L3 nerve root.

In February 2010, Dr. Prater started Mr. Alarid on Neurontin for his pain and gave him a referral for an epidural injection, but noted that he had full range of motion in his upper and lower extremities. In March he received an epidural injection in his left knee. He returned to Dr. Prater in April 2011 for both knee and back pain. He told her that an epidural injection in his back helped for only one week and that the Neurontin did not help him, although he found some relief with Percocet. He had a normal gait and range of motion in both his lower and upper extremities but was referred to neurosurgery for lower back pain. An arthritis blood screen was negative or normal for all indicators.

Mr. Alarid was reexamined by Ms. Shields, his nurse practitioner, in June 2011. He complained of lower back pain, shooting pain in his legs, and numbness in his arms, hands and left calf. When examined, he had normal general strength and tone in his lower extremities, a left-sided limp, weak toe-walking, lumbar spine tenderness to palpation but not muscle spasms, a

decreased range of motion and negative straight leg test and Tinel's signs. When given an epidural injection in his lower back he experienced an 80% decrease in symptoms.

### B. Dr. Dilullo's Examination and Opinion

Dr. Dilullo performed a physical examination on Mr. Alarid on September 4, 2010. Prior to the examination, he reviewed several medical records, including Dr. Daines' April 2010 treatment note that diagnosed Mr. Alarid with left knee arthritis and recommended eventual knee replacement surgery. During the examination, Mr. Alarid complained of chronic left knee pain with swelling and decreased range of motion which was exacerbated by weight bearing. He also complained of chronic lower back pain that made it harder for him to sit for long periods. His self-described limits were standing, walking and sitting for no more than 15 minutes at a time. He told Dr. Dilullo that he could do some cooking and cleaning but did no yard work and had no hobbies. The physical exam had the following results: no exaggeration or inconsistency during testing; significant left-side limp; normal Romberg test and upper extremity coordination; negative straight leg tests; reduced range of motion in the left knee with mild swelling, mild medial and lateral joint line tenderness and mild patellar grind tenderness; negative Lachman and McMurray knee tests, although Mr. Alarid was guarding during the tests and had numbness in the left knee; normal muscle strength, bulk and tone as well as normal reflexes. Based on these examination results, Dr. Dilullo concluded that Mr. Alarid had degenerative joint disease in his left knee and paraspinal muscle spasms in the lumbar spine. He concluded that Mr. Alarid ultimately would need a total left knee replacement, but until then he had the following functional limits: standing and walking up to four hours in and eight hour workday as long as he can change position two to three times per hour; avoidance of ladders; occasional kneeling,

stooping and crouching but with the caveat that these actions will cause pain and should be avoided; and no heights or use of left foot pedals.

### C. Mr. Alarid's Statements About His Subjective Symptoms and Functional Limitations

In his July 2010 disability application, Mr. Alarid wrote that his knee and lower back pain were continuous, that exercise and physical therapy did not help, and that the medications he took (including Meloxicam, Cycloenzapr, ibuprofen and Neurontin) had little benefit but did cause side effects including dizziness, drowsiness and stomach irritation. Functionally, he had trouble lifting more than ten pounds, carrying, kneeling, walking more than fifty feet at a time and standing up. He struggled to put weight on his left knee, get in and out of the tub and performing more than an hour or two of household chores. Finally, he wrote that he was unable to drive and do anything that required standing.

During the July 2011 hearing, Mr. Alarid described both his pain and the functional consequences of that pain. He awakened early as he had trouble sleeping due to pain, which he rated at seven to nine in his back and seven in his knees. After taking his medication, he would lie down between six and eight hours during the day for pain relief. Roughly once a week he would also have to lie down due to lower back spasms.

He stated that he was able to stand and walk for ten to fifteen minutes and sit for twenty minutes at a time, lift ten to fifteen pounds, had problems climbing stairs and moved to a single level home for that reason. Due to his impairments, he was forced to occasionally use a cane or crutches, particularly in the winter. Although he sporadically took several medications (including Prednisone, Flexeril, meloxicam and Percocet) the only one that provided some relief was Percocet. He testified that none of these had side effects. To reduce swelling in his left knee, he would elevate it once or twice per day for about twenty to thirty minutes.

**III.     Issues Presented**

Mr. Alarid raises four challenges to the Commissioner's Decision: (1) the ALJ's assessment of Dr. Dilullo's opinion was based on the wrong legal standard and not supported by substantial evidence; (2) the ALJ's assessment of Mr. Alarid's subjective symptoms was based on the wrong legal standard and not supported by substantial evidence; (3) the ALJ's RFC assessment was based on the wrong legal standard and not supported by substantial evidence; and (4) the ALJ's finding that Mr. Alarid could perform his past relevant work was based on the wrong legal standard and not supported by substantial evidence. For the reasons stated below, the Court concludes that none of Mr. Alarid's challenges merit reversal and remand.

**IV.     Standard of Review**

Judicial review of the Commissioner of Social Security's determination that a claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003); 42 U.S.C. § 405(g). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). On appeal, a reviewing court's job is neither to "reweigh the evidence nor substitute our judgment for that of the agency." *Branum v. Barnhart*, 385 f.3d 1268, 1270, 105 Fed. Appx. 990 (10th Cir 2004) (*quoting Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

The ALJ is required to consider the medical opinions in the record, along with the rest of the relevant evidence. 20 C.F.R. § 404.1527(b). When evaluating medical opinions, the medical opinion of an examining physician or psychologist is generally given more weight than the

medical opinion of a source who has not examined the claimant. The ALJ should evaluate an examining physician's medical opinion according to the factors outlined in § 404.1527. Those applicable to an examining physician include:

> 1) The degree to which the physician's opinion is supported by relevant evidence;
> 2) Consistency between the opinion and the record as a whole;
> 3) Whether or not the physician is a specialist in the area upon which an opinion is rendered; and
> 4) Other factors brought to the ALJ's attention which tend to support or contradict the opinion.

§ 404.1527.

Having considered these factors, the ALJ must give good reasons in the decision for the weight assigned to a treating source's opinion. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Luttrell v. Astrue*, 453 Fed.Appx. 786, 794 (10th Cir. 2011) (unpublished). The ALJ is not required to explicitly discuss all the factors outlined in § 404.1527. *Oldham*, 509 F.3d at 1258; SSR 06-03p. However, the ALJ must discuss not just evidence that supports the decision, but also "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (citation omitted).

The ALJ is also required to assess a claimant's RFC based on all relevant evidence, medical or otherwise. § 404.1545. As part of this evaluation, the ALJ must take into consideration all the claimant's symptoms, including subjective symptoms. § 404.1529(a). Subjective symptoms are those that cannot be objectively measured or documented. One example is pain, but there are many other symptoms which may be experienced by a claimant that no medical test can corroborate. By their nature, subjective symptoms are most often identified and described in the testimony or statements of the claimant or other witnesses.

In assessing subjective symptoms, the ALJ must consider statements of the claimant relative to objective medical evidence and other evidence in the record. § 404.1529(c)(4). If a

claimant has a medically determinable impairment that could reasonably be expected to produce the identified symptoms, then the ALJ must evaluate the intensity, severity, frequency, and limiting effect of the symptoms on the claimant's ability to work. § 404.1529(c)(1); SSR 96-7p.

In the 10th Circuit, this analysis has three steps: 1) the ALJ must determine whether there is a symptom-producing impairment established by objective medical evidence; 2) if so, the ALJ must determine whether there is a "loose nexus" between the proven impairment and the claimant's subjective symptoms; and 3) if so, the ALJ must determine whether, considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling. *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987). The third step of the *Luna* analysis involves a holistic review of the record. The ALJ must consider pertinent evidence including a claimant's history, medical signs, and laboratory findings, as well as statements from the claimant, medical or nonmedical sources, or other persons. § 404.1529(c)(1). In addition, § 404.1529(c)(3) instructs the ALJ to consider:

1) The individual's daily activities;
2) The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) Factors that precipitate and aggravate the symptoms;
4) The type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms…; and
7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Inherent in this review is whether and to what degree there are conflicts between the claimant's statements and the rest of the evidence. *Id*. Ultimately, the ALJ must make specific

evidentiary findings[3] with regard to the existence, severity, frequency, and effect of the subjective symptoms on the claimant's ability to work. § 404.1529(c)(4). This requires specific evidentiary findings supported by substantial evidence. *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988); *Diaz*, 898 F.2d at 777.

## V. Discussion

### A. Dr. Dilullo's Medical Opinion

Mr. Alarid's first challenge is to the weight given Dr. Dilullo's medical opinion. In the Decision, Dr. Dilullo's opinion was given great weight for several reasons: it was well supported by the evidence; Dr. Dilullo personally examined Mr. Alarid after listening to his subjective complaints and his examination included physical limitation testing. Mr. Alarid argues that Dr. Dilullo's September 2010 opinion should not have been given great weight for two reasons: 1) Dr. Daines' operative observations during an October 2010 arthroscopy contradict Dr. Dilullo's September 2010 opinion as to functional limitations of the knee; and 2) no functional limitations were included for Mr. Alarid's hand numbness. Neither argument is persuasive.

It is fair to note that during the surgery Dr. Daines observed the problems inside of Mr. Alarid's knee – the medial compartment had grade three to four changes throughout, there was a

---

[3] Often these findings are described as "credibility determinations". Technically, the credibility assessment is as to particular testimony or statements. But this characterization often improperly leads ALJs and claimants to focus upon whether the claimant is believable or "telling the truth". Such focus is reflected in ALJ references to the "claimant's credibility" and claimants' frequent umbrage on appeal at findings that suggest that they were untruthful.

Greater precision in distinguishing between the credibility of particular testimony as compared to general credibility of a claimant is helpful for subsequent review. It is also worth recognizing that determining the ontological truth or falsity of a claimant's statements is rarely necessary. Indeed, the searching inquiry required of the ALJ assumes that the claimant experiences a symptom that cannot be objectively documented – pain, confusion, ringing in the ears, tingling, nausea and the like. The focus of the inquiry need not be to determine whether the claimant is truthfully reporting his or her experience, but instead to determine whether such symptom corresponds to a severe impairment and whether its nature, intensity, frequency and severity affects the claimant's ability to work. *See e.g. Diaz v. Sec. of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)

meniscus tear, the ACL notch was completely filled with scar material, the patellofemoral compartment had essentially no cartilage on the patella with grade two or three changes in the trochlea, the lateral compartment had two large, loose bodies and grade two or three changes, and there were crystal deposits throughout the knee, likely due to crystalline pyrophosphate disease.  However, Mr. Alarid does not explain how these observations change Mr. Alarid's functional abilities as measured by Dr. Dilullo a month earlier.  Both Dr. Dilullo and Dr. Daines anticipated that Mr. Alarid would continue to experience knee pain and would need a knee replacement.  Dr. Daines' operative findings appear to support both conclusions – a medical basis for Mr. Alarid's pain and the need for a knee replacement.  Thus, there does not appear to be any contradiction between the opinions of the two physicians.

  The second issue Mr. Alarid raises is that the ALJ should not have given Dr. Dilullo's opinion great weight because it did not address Mr. Alarid's upper extremity numbness.  Mr. Alarid is correct that Dr. Dilullo did not address functional restrictions due to hand numbness.  The question is not, however, whether the ALJ should have given the opinion great weight, but instead, whether it was error by the ALJ to assume that there were no functional limitations related to Mr. Alarid's hand numbness because Dr. Dilullo found none.  In essence, was there other medical information in the record that suggested functional limitation due to hand numbness?

  The evidence in the record shows that Mr. Alarid complained of hand numbness only infrequently, and that in 2010 and 2011 no physical examination showed abnormal hand function.  In addition, the medical record reflects neither a diagnosis nor any treatment for Mr. Alarid's complaints of hand numbness. Thus, this Court cannot say that Dr. Dilullo's opinion

was contradicted by the medical evidence of record or that the ALJ's reliance on his opinion without a functional limitation in use of hands was error.

### B. Mr. Alarid's Statements About His Subjective Symptoms:

Mr. Alarid also challenge's the ALJ's findings as to his subjective symptoms – hand numbness and back and knee pain. A significant portion of the Decision is dedicated to the evaluation of Mr. Alarid's statements. It is clear from the Decision that the ALJ applied the *Luna* test, although it was not designated as such. It also appears that the ALJ found that there were medical conditions likely to cause the knee and back pain of which Mr. Alarid complained. The area of controversy appears to be in the ALJ's application of the third *Luna* step – determination of whether his pain was disabling based on a review of all the evidence, both objective and subjective.

Mr. Alarid described his knee and lower back pain as continuous and severe, and that neither exercise nor physical therapy helped. He was unable to drive and could only stand and walk for ten to fifteen minutes; he would lie down between six and eight hours during the day for pain relief; he could only sit for twenty minutes at a time; he had problems climbing stairs; and he occasionally used a cane or crutches, particularly in the winter. To reduce swelling in his left knee, he would elevate it once or twice per day for about twenty to thirty minutes. Functionally, he had trouble lifting more than ten pounds, carrying, kneeling, walking more than fifty feet at a time and standing up. He struggled to put weight on his left knee, get in and out of the tub and performing more than an hour or two of household chores.

Mr. Alarid was prescribed several medications including Meloxicam, Cycloenzapr, ibuprofen, Neurontin, Prednisone, Flexeril, meloxicam and Percocet. Some caused side effects

such as dizziness, drowsiness and stomach irritation; some were ineffective. Only Percoset provided pain relief without side effects.

The Decision states multiple reasons for finding that Mr. Alarid's pain was not disabling:

(1) "[Mr. Alarid] has not generally received the type of medical treatment one would expect for a totally disabled individual";
(2) Treatment was successful in controlling Mr. Alarid's symptoms;
(3) No doctor placed any restriction on Mr. Alarid;
(4) He only went to one week of physical therapy;
(5) He failed to go to the dentist to get a clearance for knee surgery;
(6) Mr. Alarid was able to work in the past despite his impairments;
(7) "[Mr. Alarid] received unemployment up until July 2011, which indicated he was looking for work and holding himself out as being employable and able to work";
(8) Mr. Alarid's descriptions of his daily activities were inconsistent and hard to verify; and
(9) It was "[d]ifficult to attribute [Mr. Alarid's] limitations to medical conditions, as opposed to other reasons, in view of relatively weak medical evidence and other factors discussed in the decision."

The Court agrees with Mr. Alarid's contention that some of the reasons at (1), (4), (5) and (7) given were premised on something outside the record – the ALJ's experience and the ALJ's suspicion as to Mr. Alarid's motivation or lack thereof. This was error.

However, there are reasons directly tied to the record that reflect the holistic review anticipated by *Luna*. The medical records are remarkably consistent; they do not reflect the same severity and functional limitations that Mr. Alarid reported. For example, (3) correctly states that no treating physician limited Mr. Alarid's activities. Indeed, there are only minor physical limitations in range of motion and an ataxic gait that suggest physical impairment. Reason (9) correctly states that it is difficult to correlate a functional inability to walk, sit or stand with pain or numbness so severe as to prevent use of hands with the physical examinations performed by each physician. The medical records show several negative straight leg tests, normal strength,

muscle bulk and tone, and a lack of EMG testing for Mr. Alarid's asserted upper and lower extremity numbness.

This takes us to the question of whether Mr. Alarid's pain and numbness was so severe as to be disabling. Many medications and treatments were prescribed to address Mr. Alarid's knee and back pain. Injections for his back and knee were successful, but only for short periods of time. As to medications, the ALJ's statement that there were no side effects from the use of medication was erroneous. However, it appears that Percocet provided effective pain relief without side effects.

The ALJ also considered Mr. Alarid's activities relative to the severity and intractability of his pain. Mr. Alarid's description of his activities was inconsistent. At some junctures, Mr. Alarid said that he could not walk or stand at all; at others, he estimated that he could stand or walk for a limited to an amount of time (15 minutes) and at others it is limited to a distance – approximately 50 feet. However, Mr. Alarid went grocery shopping with his wife at least once each month and regularly cooked and performed other household chores.

The Decision reflects a holistic review of the subjective and objective evidence in service to the last analytical prong of *Luna*. Although not all of the reasons given by the ALJ for finding that Mr. Alarid's pain and numbness was not so severe, persistent or debilitating as to be disabling are sufficient, others are both sufficiently articulated and supported by the record.

### C. RFC and Step 4 Findings

In his third and fourth challenges, Mr. Alarid argues that neither the Decision's RFC nor Step 4 findings were supported by substantial evidence.

With regard to the RFC finding, Mr. Alarid contests the sufficiency of the evidence supporting the RFC in two ways. First, he incorporates his assertions from his first two

16

challenges: that substantial evidence did not support the ALJ's assessments of Dr. Dilullo's opinion or Mr. Alarid's statements about his symptoms.  Second, he argues that the ALJ failed to discuss medical evidence related to his upper and lower extremity numbness, anxiety and depression, and medication side effects.  Having already addressed Mr. Alarid's challenges to the weight given Dr. Dilullo's opinion, the Court turns to the ALJ's discussion of his other alleged impairments, and finds none sufficiently supported by the record to be included at Step 2 or in formulation of the RFC.

At Step 2, the ALJ considered, and rejected, Mr. Alarid's assertions of severe hand numbness and swelling.  This finding was based on a lack of supporting medical evidence and the ALJ correctly states that the record includes a single instance in which upper extremity numbness was mentioned: a note from June 2011 in which Ms. Shields wrote that Mr. Alarid complained of arm and hand numbness.  Given this lack of supporting medical evidence, the Court finds no error in the Step 2 finding.

Similarly, Mr. Alarid's assertions of lower body numbness are not supported by the record (the only mention of this impairment was also found in Ms. Shield's June 2011 medical notes).  Although the Decision does not discuss lower body numbness, any error was harmless considering both the lack of medical evidence supporting this impairment and the fact that the Decision included significant functional limits related to Mr. Alarid's left knee impairment.

Mr. Alarid also contends that the ALJ overlooked impairments due to anxiety and depression in formulation of the RFC.  Complaints as to these conditions are also mentioned only once in the record.  In a January 2011 treatment note, Dr. Prater wrote that Mr. Alarid reported anxiety.  In an April 2011 treatment note, Dr. Prater recommended amitriptyline or Cymbalta

17

based on an assessment of depression, however neither medication was prescribed. No other medical records document diagnosis or treatment for these impairments.

Finally, Mr. Alarid argues that the ALJ mistakenly concluded that he "never made subjective complaints to treating providers regarding the side effects of medications." Although he is technically correct (in May 2010, Mr. Alarid told a nurse practitioner, Ms. Phillips, that Flexeril was making him jumpy and interfering with sleep), Mr. Alarid subsequently testified at the July 2011 hearing that he experienced no side effects from Percocet, Flexeril and Meloxicam. Given this testimony, the Decision did not err in omitting functional limitations related to side effects from the RFC.

Finding that the RFC was supported by substantial evidence, the Court turns to Mr. Alarid's final challenge. In contesting the Step 4 finding that he could return to past work, Mr. Alarid argues that the hypothetical questions posed by the ALJ to the vocational expert did not include all of his impairments. Mr. Alarid makes the broad assertion that all of his impairments were not included in the hypothetical questions, but he does not specify which impairments were missing. The Court assumes that Mr. Alarid is referring to numbness, depression, anxiety and medication side effects previously discussed. Having found that the ALJ did not err in not addressing these alleged impairments at Step 2 or in formulation of the RFC, there was no error in not including them in a hypothetical question to the vocational expert.

For the forgoing reasons, the Commissioner of Social Security's decision is

**AFFIRMED.** Any request for attorney fees shall be made within 14 days. The Clerk shall enter a Judgment in accordance herewith.

DATED this 4th day of December, 2013.

**BY THE COURT:**

_____
Marcia S. Krieger
United States District Judge